UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| G. JOHN CENTO as the Personal Representative of the ESTATE OF THOMAS SHANE MILES,<br><br>Plaintiff,<br><br>v.<br><br>MARION COUNTY SHERIFF'S OFFICE, MARION COUNTY, and PATRICK BELANGER,<br><br>Defendants. | Case No. 1:17-cv-00431-TWP-DLP |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants Marion County Sheriff's Office ("MCSO"), Marion County, and Patrick Belanger ("Belanger") (collectively, "Defendants") (Filing No. 52). Plaintiff G. John Cento, as Personal Representative of the Estate of Thomas Shane Miles ("the Estate"), initiated this lawsuit, asserting claims under 42 U.S.C. § 1983 as well as a wrongful death claim under Indiana state law after Thomas Shane Miles ("Miles") tragically killed himself while in a holding cell at the City-County Building in Indianapolis, Indiana in 2016. The Defendants filed their Motion for Summary Judgment, arguing that they are entitled to judgment as a matter of law on various grounds. For the following reasons, the Court **grants in part and denies in part** the Motion for Summary Judgment.

### I. BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Miles as the non-moving

party.  *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

On August 24, 2016, Miles was arrested and taken to the Marion County Jail where he was initially screened by the jail's medical contractor.  He was evaluated medically and psychologically, including an evaluation for suicide risk (Filing No. 52-1).  The screening report noted that Miles had a psychiatric history (psychotropic medication or treatment) and had previously attempted suicide, but the sixteen other suicide risk factors were marked negative.  *Id.* at 3–4.  This screening qualified Miles for a mental health referral but not for placement on immediate suicide watch.  *Id.* at 4.  Miles was prescribed Librium to prevent drug withdrawal symptoms.  *Id.* at 7.

On August 28, 2016, Miles tried to harm himself twice while he was in jail.  He threw himself down a set of stairs and injured his knee, and he ingested the contents of a chemical ice pack that was given to him after the incident on the stairs.  Medical treatment was promptly provided for each of these incidents (Filing No. 52-2; Filing No. 52-3).  A nurse noted that "inmate states he attempted to harm himself."  *Id*.  Miles was monitored through that night and next morning (Filing No. 52-3).

On August 29, 2016, Miles underwent a mental health evaluation.  It was noted that he had ingested the contents of a chemical ice pack.  The evaluator also noted that Miles had "cut his wrists, took a bunch of pills and ended up in the hospital" about ten years earlier, but he did not receive mental health treatment at that time (Filing No. 52-4 at 2).  Miles reported that he was very depressed and had been his whole life.  He admitted that he was trying to kill himself when he ingested the ice pack contents but then said that he just wanted help and wanted to be put on an

anti-depressant. *Id.* at 3. The evaluator referred Miles to psychiatry for an August 31, 2016, appointment and to mental health special needs later in September. *Id.* at 4.

Beginning on August 29, 2016, Miles was assigned to the "suicide segregation" cell block (Filing No. 52-9). As of this date, he was under constant observation because he was designated as being acutely suicidal (Filing No. 52-13 at 2; Filing No. 65-6 at 3). He was clothed in a "suicide smock" or "suicide gown," which is specially designed to prevent inmates from using their clothing to hang themselves. The smocks are one way that the jail reduces the risk of inmate suicides. The smocks are designed to come off easily and to open easily with Velcro straps keeping them closed in the back, and they are tear resistant (Filing No. 52-5 at 12; Filing No. 52-13 at 1–2).

On August 30, 2016, Miles was scheduled for a court appearance at the City-County Building ("CCB") in Indianapolis. In accordance with the jail's standard practice, Miles was changed from his smock into standard-issued jail clothing before being transported to the CCB. He was transported from the jail to a holding cell on the fourth floor of the CCB (Filing No. 52-12 at 11; Filing No. 52-11 at 5). The morning of August 30, 2016, was a typical morning in the CCB holding cells with a lot of inmate movement as inmates were brought to and from court hearings. There were fourteen inmates who were transported between the jail, the holding cells, and the courts that morning. The inmates were frequently observed and monitored because of this frequent inmate movement for court hearings (Filing No. 52-13 at 2–3).

Deputy Sean Gray ("Gray") transported Miles to the CCB that morning. Belanger was on duty to monitor the holding cells in the CCB on the morning of August 30, 2016. Gray informed Belanger that Miles was a suicide risk. (Filing No. 65-3 at 2.) Belanger was required to make rounds through the holding cells to physically monitor the inmates every fifteen minutes (Filing

No. 52-12 at 7–10). When monitoring inmates who were a suicide risk, the monitoring deputy was required to complete a "suicide observation sheet" and record each of the observations of the inmate while they were in the holding cell. *Id.* After Miles was returned to the holding cell following his court hearing, Gray and Belanger discussed the fact that Miles was a suicide risk but that they did not have a suicide observation sheet for Miles. There were other inmates in the holding cell when Miles was initially returned to the holding cell following his court hearing. Over time, the other inmates were removed from the holding cell, which eventually led to Miles being left alone in the holding cell. *Id.* at 12–16.

Because he did not have a suicide observation sheet for Miles, Belanger left the holding cell area to search for an observation sheet. While away from the holding cells, Belanger also went to the restroom. As a result, Miles was left alone in the holding cell without observations by Belanger for about thirty to forty-five minutes. *Id.* at 15–17; Filing No. 65-5 at 21. Other than knowing that Miles was on suicide watch, Belanger did not have any other information about Miles' state of mind or the history of his previous attempts to harm himself. Belanger was not aware of the level of imminent risk that Miles posed to commit suicide (Filing No. 52-16).

Without anyone present to observe him, Miles hanged himself in the holding cell "by ripping a small section from the rear portion of his jail issued orange shirt around the rear portion of the neck and placed the torn area over the top hinge of a door." (Filing No. 65-3 at 2.) At approximately 11:15 a.m., other deputies who were transporting inmates to the holding cells discovered Miles hanging in the holding cell. They radioed for assistance, removed Miles from the door hinge, and immediately started CPR until medical personnel arrived. Belanger returned to the holding cell area after hearing the radio traffic. Miles was transported to Eskenazi Hospital

for treatment, where he was eventually taken off life support and declared deceased on September 2, 2016. *Id.* at 2–3.

On February 10, 2017, Plaintiff G. John Cento filed this lawsuit on behalf of Miles as the personal representative of his estate ([Filing No. 1](#)). In the Amended Complaint, the Estate asserted claims under 42 U.S.C. § 1983 for violation of his Fourteenth Amendment due process rights against the MCSO, Marion County, Belanger, and Gray. The Estate also asserted a claim under Indiana state law for wrongful death against all four defendants ([Filing No. 25](#)).

On March 26, 2018, the parties filed a Joint Stipulation of Dismissal, wherein all claims asserted against Gray were dismissed, and Count II (the wrongful death claim) was dismissed as to Belanger ([Filing No. 61](#)). As a result, the remaining claims are the wrongful death claim against the MCSO and Marion County and the Fourteenth Amendment due process claims against the MCSO, Marion County, and Belanger.

On February 20, 2018, the Defendants filed their Motion for Summary Judgment ([Filing No. 52](#)). The Defendants argue that they are entitled to judgment as a matter of law based on qualified immunity, state statutory immunity, and state common law immunity. They also argue the Estate cannot support the due process claim because there is no evidence of deliberate indifference on the part of the Defendants.

## II. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 106 S.Ct. 1348 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

5

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III. DISCUSSION

In their Motion for Summary Judgment, the Defendants argue that they are entitled to judgment in their favor based on various immunities and because the evidence does not support a

claim that the Defendants were deliberately indifferent to Miles' constitutional rights. The Court will first address the state law claim against the MCSO and Marion County and then turn to the Fourteenth Amendment claims against the MCSO, Marion County, and Belanger.

A.      **Wrongful Death Claim Against the MCSO and Marion County**

The Estate asserts a wrongful death claim under Indiana law against the MCSO and Marion County based on the Defendants' duty to take reasonable precautions to preserve Miles' life, health, and safety. The Estate asserts the Defendants knew of Miles' suicidal tendencies and the high likelihood that he would try to commit suicide while in their custody. Despite this knowledge, the Defendants failed to take appropriate measures to deprive Miles of the opportunity and means to commit suicide. Because of their acts and omissions, the Defendants breached their duty to Miles, which caused his death.

The Defendants argue that "law enforcement immunity" under the Indiana Tort Claims Act ("ITCA") bars the wrongful death claim against the MCSO and Marion County based on the adoption and enforcement of laws, rules, or regulations that are within the scope of a law enforcement entity's purpose and operations. They point out that the Amended Complaint alleges the MCSO and Marion County are "responsible for formulating, implementing, and monitoring the effective use of protocols and procedures to properly and comprehensively evaluate inmates for suicidal tendencies, and to prevent potentially suicidal inmates from committing suicide." ([Filing No. 25 at 4](), ¶ 24.) The Estate further alleges that the Defendants "fail[ed] to develop adequate procedures and protocols, and/or fail[ed] to monitor or implement existing procedures and protocols." (*Id.* at 5, ¶ 31.)

The ITCA "granted absolute immunity to governmental entities in a number of specific circumstances, and codified rules of liability for other areas of governmental activity." *F.D. v.*

*Ind. Dep't of Child Servs.*, 1 N.E.3d 131, 136 (Ind. 2013) (citation and quotation marks omitted). Furthermore, the "negligence of a defendant is not relevant if it is immune. Immunity assumes negligence but denies liability." *Id.* (citation and quotation marks omitted). The law enforcement immunity of the ITCA provides, "A governmental entity . . . is not liable if a loss results from . . . [t]he adoption and enforcement of or failure to adopt or enforce . . . a law (including rules and regulations) . . . ." Ind. Code § 34-13-3-3(8).

Law enforcement immunity encompasses activities related to the enforcement of a statute as well as rules and regulations, thereby immunizing "a variety of administrative and executive functions." *King v. Northeast Sec., Inc.*, 790 N.E.2d 474, 482 (Ind. 2003). Immunity attaches when the governmental activity involves the adoption or enforcement of laws, rules, or regulations (or the failure to do so) "that falls within the scope of the entity's purpose or operational power" and are, thus, "within the assignment of the governmental unit." *Id.* at 482, 483.

Based on this case law and statutory provision of the ITCA, the Defendants argue that the MCSO and Marion County are immune against the Estate's Indiana tort claim for wrongful death because preventing the suicide of inmates is within the scope of their operational power and purpose in adopting and enforcing laws, rules, or regulations.

The Estate responds that Indiana case law has explicitly held that law enforcement immunity under the ITCA "does not encompass the treatment of pretrial detainees and is limited to circumstances surrounding the apprehension of suspects." *Tittle v. Mahan*, 582 N.E.2d 796, 797 (Ind. 1991). Thus, the Estate asserts, law enforcement immunity does not apply to this case where the injury involved the treatment and care of a pretrial detainee.

The Defendants correctly reply that *Tittle* is no longer good law for its narrow application of the law enforcement immunity, pointing to subsequent Indiana Supreme Court and Court of

8

Appeals decisions. *See Quakenbush v. Lackey*, 622 N.E.2d 1284, 1285, 1287 (Ind. 1993) ("[W]e abandon the *dicta* of our earlier decision in *Tittle* . . . . [T]he statements in *Tittle* do not comport with any sound legal principle other than *stare decisis*. Therefore, we begin anew our analysis of Section 3(7)."); *King*, 790 N.E.2d at 481 n.4 ("The Court subsequently revisited the issue in *Quakenbush* and overruled *Tittle* by reaffirming the statutory language confirming immunity under section 3(7) for the decision of any governmental entity and its employees about whether to adopt or enforce any statute, rule, or regulation."); *St. Joseph Cty. Police Dep't v. Shumaker*, 812 N.E.2d 1143, 1148 n.6, 1149, 1150 (Ind. Ct. App. 2004) ("Whether it did so explicitly, the *Quakenbush* Court, by 'beginning anew' with its analysis of Section 3(8) and rejecting the reasoning of *Tittle*, effectively overruled that case. . . . [T]he narrow scope of immunity set forth in *Tittle* has also been abandoned. . . . [T]he legal reasoning underlying *Tittle*, if not the result reached in that case, has been abandoned.").

A review of the decisions in *Tittle*, *Quakenbush*, *King*, *St. Joseph County Police*, and the other decisions cited by the parties reveals that *Tittle's* narrow scope of the law enforcement immunity—applying it only to circumstances surrounding the apprehension of suspects and not to the treatment of pretrial detainees—is no longer the standard in Indiana. Instead, the scope of the law enforcement immunity reaches activities within the operational purpose and power of the specific law enforcement entity based on the adoption and enforcement of laws, rules, or regulations. *See King*, 790 N.E.2d at 481 n.4, 482, 483; *St. Joseph Cty. Police*, 812 N.E.2d at 1150–51.

Law enforcement immunity under the ITCA applies to the Estate's wrongful death claim against the MCSO and Marion County. This conclusion is consistent with the Estate's pleadings, the Fourteen Amendment claim, and the evidence that the MCSO and Marion County were

9

responsible for the care and custody of its inmates, whether pretrial detainees or otherwise. The rules and regulations of the MCSO and Marion County for the protection of inmates against suicide, and the enforcement thereof, fall squarely within the scope of the MCSO's and Marion County's operational power and purpose.[1] This is consistent with the Estate's pleadings that the Defendants were "responsible for formulating, implementing, and monitoring the effective use of protocols and procedures to properly and comprehensively evaluate inmates for suicidal tendencies, and to prevent potentially suicidal inmates from committing suicide," and that they allegedly "fail[ed] to develop adequate procedures and protocols, and/or fail[ed] to monitor or implement existing procedures and protocols." (Filing No. 25 at 4–5, ¶¶ 24, 31.)

Because law enforcement immunity protects the MCSO and Marion County against liability for the tort claim of wrongful death, the MCSO and Marion County are entitled to summary judgment on this claim. Therefore, the Court **grants** the Defendants' Motion as to the wrongful death claim.

B.     **Fourteenth Amendment Claims Against the MCSO, Marion County, and Belanger**

The Estate asserts claims against the MCSO, Marion County, and Belanger under 42 U.S.C. § 1983 for violation of Miles' Fourteenth Amendment due process rights based on their policies and practices for supervising suicidal inmates and their failure to take steps to prevent Miles' suicide. The Defendants argue that they are entitled to summary judgment because the evidence does not support a claim that they were deliberately indifferent to Miles' constitutional rights and because Belanger enjoys qualified immunity.

---

[1] Another court in this District previously has explained that the sheriff is "to take care of the county jail and the prisoners there," and "Indiana courts have held that § 36-2-13-5(a)(7) charges the sheriff with a duty to exercise reasonable care to preserve his prisoner's health." *Strayer v. Dearborn Cty. Sheriff*, 2016 U.S. Dist. LEXIS 40073, at *10 (S.D. Ind. Mar. 28, 2016) (citations and quotation marks omitted).

1. **Constitutional Claims Against the Defendants**

The Estate's constitutional claim against Belanger is that he was deliberately indifferent to Miles' health, safety, and protection because he knew that Miles was suicidal, yet he failed to provide adequate monitoring, and he allowed Miles to have clothing that was not suicide resistant. The Estate asserts that the MCSO and Marion County were deliberately indifferent by not having the same policies and procedures in place at the CCB that were in place at the jail to protect suicidal detainees. It argues that allowing Miles to have clothing that was not suicide resistant and failing to provide adequate monitoring gave Miles the tools and the time to commit suicide, which in fact led to his suicide. To support the claim, there must be evidence of the Defendants "acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). "Risk of suicide is a serious medical need, of course." *Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017).

The parties devote a portion of their briefs arguing about *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), and other case law concerning whether the constitutional claim in this case is reviewed under an "objectively unreasonable standard" only or also under a "subjective standard." However, the Court need not address this argument because, as explained below, summary judgment is not appropriate in this case under either standard.[2]

The Defendants argue that summary judgment is appropriate because the MCSO has in place policies and procedures that address the needs and concerns of suicidal inmates. It has an

---

[2] Earlier today, the Estate filed a Notice of Supplemental Authority, bringing to the Court's attention a decision issued by the Seventh Circuit Court of Appeals just last week that resolves the argument regarding *Kingsley*. ([Filing No. 84](#)). In a deliberate indifference case, the Seventh Circuit explained, "We thus conclude, along with the Ninth and Second Circuits, that medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*." *Miranda v. Cty. of Lake*, No. 17-1603, 2018 U.S. App. LEXIS 22229, at *30 (7th Cir. Aug. 10, 2018). Thus, pursuant to *Miranda*, the objective unreasonableness standard applies here. However, because the Court has determined that summary judgment is not appropriate on the constitutional claims, it declines to further discuss application of the objectively unreasonableness standard.

inmate classification system that reduces violence and the risk of suicide. It provides its inmates with an "inmate handbook" that prohibits violence and self-harm and directs inmates to seek medical help when needed.

The MCSO's policies and practices include an initial screening of detainees to determine whether they are a suicide risk. Reevaluation is also conducted when needed. These screenings and evaluations are conducted by medical professionals. If an inmate is determined to be a suicide risk, they are placed on suicide watch under either constant observation or frequent, regular checks. A suicidal inmate is clothed in a suicide smock rather than in standard issued jail clothing. They are not given towels or linens, but instead, they sleep on tamper-proof beds and are temporarily given a towel after showering. They also are given special utensils for eating their food. They are housed in a jail block specifically designated for suicidal inmates. Additionally, jail staff are provided with annual mandatory training on suicide prevention, which teaches them how to recognize the signs of suicidal tendencies and actions and how to respond to such actions.

The Defendants argue that, while Belanger knew that Miles was on suicide watch, Belanger was not aware of the severity of Miles' suicidal ideation, and he did not know about the recent incidents of self-harm that Miles had undertaken. Thus, they argue, he could not be deliberately indifferent to a serious risk of suicide because he did not know about the severity of the risk. Furthermore, the Defendants argue that the facts make clear that Belanger left Miles unattended in the holding cell for at most forty-five minutes, but there is no controlling case law that holds leaving a suicidal inmate unattended for that length of time amounts to deliberate indifference. They also assert that Belanger had no indication that Miles was actively suicidal, so he could not have subjectively concluded that Miles would try to commit suicide.

The Estate argues in response that it was objectively unreasonable for Belanger to leave Miles unattended when he was aware that Miles was suicidal and had clothing that could be used as an instrument to commit suicide. The Estate further argues that Belanger was subjectively aware of the risk of suicide because he acknowledged that he should assume the highest risk of suicide if he did not know otherwise. The Estate points out that Belanger had actual knowledge of the risk of suicide because Belanger left his post to find a suicide observation sheet for Miles.

As to the MCSO and Marion County, the Estate argues the evidence supports a claim of deliberate indifference because they had policies and practices in place to protect suicidal inmates while they were in the jail, yet those simple policies and practices were not implemented or followed in the CCB holding cells. The Estate argues that this decision not to implement suicide prevention practices and policies in the CCB supports a claim for deliberate indifference. Replying to this assertion, the Defendants argue that logistical and practical differences between the jail and the CCB justified not having the same policies and practices at the CCB, and thus, this cannot be the basis for a claim of deliberate indifference.

The designated evidence reveals a number of factual conflicts that pertain to the alleged deliberate indifference in Belanger's actions and in the MCSO's and Marion County's policies and procedures. Additionally, there is evidence that supports a reasonable juror concluding that the Defendants were deliberately indifferent to Miles' risk of suicide in their actions and also in their policies and procedures. At the summary judgment stage, courts "do not weigh the proof, make credibility determinations, or resolve narrative disputes. Those tasks are left for the trier of fact." *Ortiz v. City of Chi.*, 656 F.3d 523, 534 (7th Cir. 2011).

There is conflicting evidence whether Belanger knew before Miles' court hearing that Miles was suicidal. An internal investigation report says Gray told Belanger before the court

hearing that Miles was suicidal (Filing No. 65-3 at 2).  But Belanger testified during his deposition that Gray did not tell him that Miles was suicidal until after the court hearing (Filing No. 52-12 at 16).  If Belanger knew before the court hearing that Miles was suicidal and that he did not have a suicide observation sheet, a reasonable juror might conclude that Belanger was deliberately indifferent to Miles' risk of suicide by not obtaining the sheet during Miles' hearing and instead waiting until Miles was alone in the holding cell to leave his post to find the sheet.

There is conflicting evidence whether Belanger conducted the 15-minute clock rounds on a timely basis or whether Miles was left unattended for an extended period of time.  The internal investigation report says Belanger reported making the required 15-minute clock rounds to check on detainees, but his records on the suicide observation sheet were only "guestimates."  (Filing No. 65-3 at 2.)  Belanger testified during his deposition that Miles was alone in the holding cell for about thirty to forty-five minutes before the suicide incident and that he left his post for about fifteen to thirty minutes to look for an observation sheet and to use the restroom (Filing No. 52-12 at 15; Filing No. 65-5 at 21).  There is no dispute that Belanger knew Miles was suicidal at the time that Miles was in the holding cell after his court hearing.  If Belanger knew that he was required to make 15-minute clock rounds, yet he choose to use the restroom and look for an observation sheet for thirty minutes while a suicidal inmate was alone, a reasonable juror might conclude that Belanger was deliberately indifferent to Miles' risk of suicide.

In *Rice v. Corr. Med. Servs.*, 675 F.3d 650 (7th Cir. 2012), the Seventh Circuit indicated that a failure to complete hourly checks on detainees was not sufficient by itself to support a deliberate indifference claim because the officers did not know of the inmate's specific risk that led to his death.  *Id.* at 680.  However, in this case, it is undisputed that Belanger knew Miles was suicidal.  Belanger testified in his deposition that he should assume a suicidal detainee is actively

suicidal if he did not know otherwise (Filing No. 65-5 at 12; *see also* Filing No. 65-2 at 7–8; Filing No. 65-4 at 6). Belanger left his post to use the restroom and find an observation sheet for fifteen to thirty minutes without asking somebody else to cover his post while he was away. Lieutenant Derek Neely testified that deputies should not be away from their post for "more than a minute or two" without asking somebody else to cover for them (Filing No. 65-8 at 6–7).

The MCSO has suicide prevention policies and procedures in place that are implemented at the jail. Jail staff are trained annually on these suicide prevention policies and procedures (Filing No. 65-1 at 6). However, the holding cells at the CCB are not part of the jail, and the deputies who worked at the CCB did not receive this annual suicide prevention training. *Id.* at 7. Pursuant to the MCSO's policies, Miles was placed on constant monitoring and was deprived of clothing and other items that could be used to commit suicide while he was in the jail. *Id.* at 10. Yet when Miles was moved to the CCB, the policies and procedures for preventing suicide were no longer implemented. Constant monitoring ended (Filing No. 65-7 at 8), and pursuant to longstanding practice of the MCSO, Miles was changed from his suicide smock into standard issued jail clothing (Filing No. 65-10 at 2). As noted above, the Defendants argued that logistical and practical differences between the jail and the CCB justified not having the same policies and practices at the CCB, yet these factual considerations are appropriately evaluated by the fact finder, not by the Court on summary judgment. A reasonable juror might conclude that choosing to not implement the jail's policies and procedures at the CCB was deliberately indifferent to a detainee's risk of suicide.

The Seventh Circuit has explained,

> [W]eigh[ing] the strength of the evidence or mak[ing] credibility determinations [are] tasks belonging to the trier of fact. At summary judgment, whether the movant's evidence is more persuasive than the evidence of the non-movant is irrelevant. The only question is whether the evidence presented, reasonably

15

construed in the light most favorable to the non-movant, creates a genuine dispute regarding any material fact precluding judgment as a matter of law.

*United States v. Funds in the Amount of One Hundred Thousand One Hundred & Twenty Dollars ($100,120.00)*, 730 F.3d 711, 717 (7th Cir. 2013) (citations omitted).

The designated evidence as well as factual conflicts in the evidence raise issues that need to be resolved by the fact finder concerning Belanger's actions toward a suicidal detainee (he had actual knowledge that Miles was suicidal). The fact finder also needs to resolve issues concerning the policies and practices of the MCSO and Marion County at the CCB's holding cells. There is sufficient evidence that could support a reasonable juror concluding that the Defendants were deliberately indifferent to Miles' risk of suicide, and thus, summary judgment is not appropriate on the deliberate indifference claims.

### 2. **Qualified Immunity**

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and quotation marks omitted). In determining whether qualified immunity applies, courts decide "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 232. "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.*

The Defendants acknowledge that there is a constitutional right for pretrial detainees to receive protection against their own desires to commit suicide. However, the Defendants assert,

> "[A]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . .

placed the statutory or constitutional question beyond debate." *City & Cty. of San Francisco, Cal. v. Sheehan*, 135 S. Ct. 1765, 1774, 191 L. Ed. 2d 856 (2015) (second and third alteration in original) (citation omitted) (internal quotation marks omitted). To address this question, the Supreme Court has instructed us that we must define the right in question with a sufficient degree of particularity.

*Kingsley v. Hendrickson*, 801 F.3d 828, 832 (7th Cir. 2015).

The Defendants argue that application of the right for pretrial detainees to receive protection against their own desires to commit suicide in the context of this case does not demonstrate violation of clearly established law. The Defendants argue, "*Rice* [*v. Corr. Med. Servs.*, 675 F.3d 650 (7th Cir. 2012)] and other cases from the Seventh Circuit establish that hourly observations of suicidal inmates (the only act Plaintiff can argue the individual Defendants are responsible for) is sufficient for Due Process purpose." (Filing No. 53 at 12.)

Contrary to the Defendants' assertion, *Rice* and the "other [unidentified] cases from the Seventh Circuit" do not establish that "hourly observations of suicidal inmates is sufficient for Due Process purpose[s]." In *Rice*, the Seventh Circuit considered an incident involving a severely mentally ill inmate who died because of water intoxication, which medical personnel determined was not a suicide. In affirming summary judgment, the Seventh Circuit explained that the evidence in that case could not support a claim of deliberate indifference toward the specific risk of water intoxication; however, the court did not establish that hourly checks on suicidal inmates was sufficient for due process purposes. *Rice*, 675 F.3d at 678–81.[3]

The Seventh Circuit has unequivocally stated,

There can be little debate that it was clearly established, long before 1998, that prison officials will be liable under Section 1983 for a pretrial detainee's suicide if they were deliberately indifferent to a substantial suicide risk. Further, it was clearly established in 1986 that police officers could not be deliberately indifferent to a

---

[3] In fact, the Seventh Circuit noted, "A factfinder might conclude that the guards exhibited a generalized recklessness with respect to the safety of the inmates housed on Ward One by failing to conduct hourly checks of the administrative segregation unit." *Rice*, 675 F.3d at 679.

17

> detainee who is in need of medical attention because of a mental illness or who is a substantial suicide risk.

*Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (citation and quotation marks omitted).

As the Estate points out, the Seventh Circuit very recently addressed the issue of the level of specificity when defining a clearly established right for purposes of qualified immunity.

> Courts may not define clearly established law at too high a level of generality, but there is no such problem here. The Supreme Court has long held that prisoners have an Eighth Amendment right to treatment for their "serious medical needs." For purposes of qualified immunity, that legal duty need not be litigated and then established disease by disease or injury by injury. Risk of suicide is a serious medical need, of course. Accepting the facts described by the district court, [the plaintiff] has offered sufficient evidence for a jury to find that [the defendant] actually knew about [the plaintiff's] serious risk of suicide. . . . [The defendant] should have taken action based on this knowledge, yet he chose to do nothing. Our precedent establishes that "particular conduct" such as this violates clearly established law.

*Estate of Clark*, 865 F.3d at 552–53 (citations omitted). The Defendants' efforts to factually distinguish this case from *Estate of Clark* is unavailing. The factual distinctions do nothing to undermine the applicability of the legal principle set out in *Estate of Clark* that a high level of specificity is not required in defining the clearly established right that an officer may not be deliberately indifferent to a detainee's substantial suicide risk. That right was clearly established at the time of Miles' suicide. *See Sanville*, 266 F.3d at 740.

Because the Court has determined that factual disputes exist regarding whether there was deliberate indifference to a substantial suicide risk (which would be a constitutional violation), summary judgment is not appropriate on the basis of qualified immunity. *See DuFour-Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998) ("Because the facts are in hot dispute, the officers cannot seek pretrial refuge behind a claim of qualified immunity . . . , and a fact finder must decide if [the plaintiff] can prove that [the defendants] acted in this fashion.").

18

The Defendants argue that the MCSO and Marion County cannot be held liable on a *Monell* claim if there is no viable claim against an individual defendant, and they further argue, because there is no constitutional claim made against any of the individual deputies that can proceed to trial, the *Monell* claim against them must also be dismissed. They also assert that there are no customs, policies, or practices that can support a *Monell* claim. Based on the Court's determinations about qualified immunity and the deliberate indifference claims, the Court concludes that these arguments from the Defendants are not meritorious and summary judgment is **denied**.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part** (Filing No. 52). Summary judgment is **granted** on the claim for wrongful death against the Marion County Sheriff's Office and Marion County, and this claim is **dismissed**. Summary judgment is **denied** on the claims for deliberate indifference against the Marion County Sheriff's Office, Marion County,[4] and Belanger, accordingly these claims may proceed to trial.

**SO ORDERED.**

Date: 8/15/2018

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

---

[4] It appears that MCSO and Marion County are one and the same party and entity. The Amended Complaint alleges, "Defendants Marion County Sheriff's Office and Marion County at all times relevant to this action operated and maintained the Marion County Jail, which is located in Indianapolis, Indiana." (Filing No. 25 at 2, ¶ 8.) There appears to be no distinction between these two defendants. To avoid confusion and duplicity, the parties should confer and determine whether Marion County should be dismissed as a party to this action should it proceed to trial.

DISTRIBUTION:

Colin E. Flora
PAVLACK LAW, LLC
Colin@PavlackLawFirm.com

Eric S. Pavlack
PAVLACK LAW LLC
eric@pavlacklawfirm.com

Anthony W. Overholt
FROST BROWN TODD LLC
aoverholt@fbtlaw.com

Adam Scott Willfond
OFFICE OF CORPORATION COUNSEL
adam.willfond@indy.gov